IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:07-CR-162 |
| V. | ) | (Varlan / Shirley) |
| | ) | |
| RICHARD EUGENE JONES, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition, or report and recommendation regarding disposition, by the District Court as may be appropriate. This matter came before the Court on May 2, 2008, for an evidentiary hearing on the merits of defendant Richard Eugene Jones' Motion to Suppress [Doc. 14]. Mr. Jones was present for the hearing with his attorney, Kim Tollison. Assistant United States Attorney Tracy Stone represented the United States in this matter. The Court received testimony from Knoxville Police Department Officer Adam Moore and received seven exhibits into evidence. Given the importance of the factual details of the automobile stop to this motion to suppress, and the importance of accuracy, counsel asked for time to review the transcript of the hearing and file post-hearing briefs. The Court granted leave to file post-hearing briefs. Mr. Jones filed a post-hearing brief on May 23, 2008; the government responded on June 2, 2008. After receiving briefs of the parties, the Court took this matter under advisement on June 3, 2007. After consideration of the record, arguments of the parties and caselaw, the Court respectfully recommends the Motion to Suppress [Doc. 14] be denied.

## A. FINDINGS OF FACT

The Court makes the following factual findings. At 1:45 a.m. on August 28, 2007, KPD officer Adam Moore ("Moore") stopped a white sedan on Martin Luther King, Jr. Boulevard because the car did not have a proper license plate light. [Tr. at 11]; Exhibit 1. Richard Jones ("Jones") was the driver of the white sedan; he was alone in the car. Moore approached the driver's window and told Jones the reason he was stopped, asking for Jones' driver license. Jones produce his license and Moore returned to his patrol car; the time was 1:46 a.m. [Exhibit 1]. Moore immediately radioed to verify the license was valid and to request a local criminal history check, also at 1:46 a.m. [Tr. at 17]; Exhibit 1. At 1:49 a.m., Moore learned from the police records channel that the license was valid and that the were no outstanding arrest warrants for Jones, [Tr. at 19] Exhibit 1. In addition, the records channel reported a felony drug conviction and other offenses Jones had been charged with in the past, including a dismissed weapon charge. Upon hearing this information, Moore "grabbed [his] cell phone and called for a K-9." [Tr. at 19 - 20]. Moore's request for a drug detecting dog was made at 1:49 or 1:50 a.m. [Tr. at 21]; Exhibit 1. At 1:50 a.m., the canine unit responded that he was en route to Moore's location. Exhibit 1. Under ideal circumstances, it would take Moore 5 to 10 minutes to write a traffic citation. [Tr. At 36].

At 1:53 a.m., another beige sedan pulled in ahead of the white sedan and Jones' grandmother approached the scene on foot. As she engaged Jones in conversation from the curb, Moore left his cruiser to interact with her. Moore and Jones' grandmother discussed the reason for the stop and what the officer preferred that she do while waiting for the stop to be complete. In fact, Moore explained at the outset that this was about a "simple equipment violation" and "I am trying to write a citation" and that Jones' grandmother's arrival "is just prolonging it a little bit." Exhibit 1 at 1:53.

There were six or seven exchanges between Moore and Jones' grandmother before the officer could return to the task of issuing the citation. After their discourse appeared to be complete, Moore turned to walk back to his patrol car and Jones' grandmother called Moore back to ask whether Jones would be able to drive his car home. After answering her question that Jones would be able to drive his car from the scene after the ticket, at 1:55 a.m., Moore is heard opening the cruiser door and sitting back in his seat, evidently to resume writing the ticket.

Moore returned to his cruiser at 1:55 a.m.. Exhibit 1. At 1:57 a.m. the canine unit, comprised of KPD Officer Michael Perry with a police dog Ares, arrived at Jones' car. The officer and dog began circling Jones' car, walking away at 1:58 a.m. Moore explained to Jones that the narcotics dog was called based on Jones' criminal history and because Moore had observed Jones "driving around." Exhibit 1. Moore and Jones continued the discussion about the dog and the traffic citation as the drug-detecting dog completed his inspection. At 2:00 a.m., this conversation was ongoing when Officer Perry reported to them that the dog alerted to the odor of narcotics in Jones' car. Exhibit 1. At 2:01 a.m., Moore was obtaining Jones' Social Security Number and telephone number as Perry began the physical search of Jones' car. Based on this alert, the police searched the white sedan and discovered three guns, which are the subject of the instant indictment.[1] Moore issued the citation at 2:04 a.m., and continued to explain it to the defendant, after the canine alert.

Moore testified that Jones was nervous and upset that he had been stopped, and described the interaction as "not your typical traffic stop." [Tr. at 41]. Jones made Moore wary due to "[h]is attitude toward me initially, his [criminal] history, the fact that we're in a high-crime area is kind

---

[1] Perry testified that no narcotics were found in the car, although "I found a few - I'm not sure - I believe it was marijuana residue in the carpet, but there was not much at all and it was just ground up," later clarifying that no substance was collected or tested and Perry had "no idea" what the material was and "it could have been grass." [Tr. at 63, 68].

of scarey." [Tr. at 48].

Moore testified that if the process of issuing a traffic ticket had been completed before Officer Perry and his drug-sniffing dog had arrived, Jones would not have been detained for the canine inspection, testifying as follows:

> Q: All right. Now, and you did that by cell phone, too, is that right?
>
> A. Yes.
>
> Q. Okay. Now, at that point you weren't going to let him go until the K-9 unit got there, were you?
>
> A. Not necessarily.
>
> Q. Are you telling me you would have written the ticket, let him go, before the K-9 unit got there?
>
> A. If it took the K-9 unit 45 minutes to get there and I'm writing a citation for a tag light, I'm going to go ahead and let him go.
>
> Q. If it takes them 10 or 15 minutes to get there, are you still going to let him go or are you going to hold him?
>
> A. <u>The point I get done writing my traffic citation, he's gone, no matter whether the K-9 unit is there or not</u>.
>
> Q. Okay. Now, you started writing your ticket at 1:47?
>
> A. Yes.
>
> Q. And the K-9 unit arrived sometime after 1:57, ten or 11 minutes later; is that correct?
>
> A. Yes.
>
> Q. And during that ten or 11 minutes is it your testimony that you hadn't even filled out this ticket?
>
> A. I hadn't completely filled it out, no. I began, I began filling the ticket out, but obviously I had not finished it by the time the K-9 unit got there.

4

[emphasis added] [Tr. at 17]

Moore asked Jones to step from his car and walk back to Moore's police cruiser so that the canine could conduct a sweep outside the white sedan. During this time, Moore completed and explained the citation, while Jones continued to engage the officer in an argument about whether Jones was responsible for the tag light. [Tr. at 17]. Jones continued to argue that he had recently purchased the car from an auto dealership and did not know the tag light was out, protracting his interaction with Moore in an apparent effort to "talk his way out" of a traffic ticket.

KPD Officer Michael Perry has been assigned to a canine unit with Ares, a German Shepherd police dog, since February 2005. Perry and Ares participated in training together in 2005, following which they attained a certification indicating they met the requirements set forth by the International Police Working Dog Association. Perry and Ares renewed their certification in 2006 and 2007. [Tr. at 57]. Copies of those certifications were introduced as Exhibits 5, 6 and 7 to the hearing. For purposes of this hearing, neither the qualifications of Ares nor his handler were challenged, and the testimony regarding training and scoring, along with the certifications introduced into the record suffice to establish the reliability of Ares. Perry testified that Ares is a passive-alert dog, that he sits down if he smells the odor of narcotics. [Tr. at 58].

On August 28, 2007, Perry was in the area of Broadway and Atlantic Avenue in north Knoxville when he responded to Moore's request for a canine unit. [Tr. at 59, 66]. It took about five or six minutes for Perry to drive to Moore's location. [Tr. at 67]. Perry and Ares took about 40 seconds to conduct their dog-sniff inspection of the perimeter of the white car. [Tr. at 62]. Ares first displayed signs of some interest in the car and ultimately he sat down, indicating a positive alert to the odor of drugs in the car. [Tr. at 59-60]. Based upon Ares' alert, Perry searched Jones' car and

5

found "three pistols under the driver's seat." [Tr. at 64].

## B: ARGUMENT

*Defendant Jones' Position*

Jones does not challenge the allegation that his license plate was not properly illuminated and agrees the traffic stop was lawful. Jones argues that his initial detention became unreasonable as it extended beyond the scope of the traffic stop. Jones argues that the purpose of the stop, to issue a citation for the traffic violation, could have been accomplished within a few minutes, but Moore's continued detention of Jones in order to wait for a narcotic detecting dog was unreasonable and lasted longer that necessary to effectuate the purpose of the stop.

In support of his position, Jones cites United States v. Bailey, 302 F.3d 652 (6th Cir. 2002), in which the Sixth Circuit held "any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to the circumstances justifying the initial interference ... Once the purposes of the initial traffic stop are completed, there is no doubt that the officer can not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention." Bailey, 302 F3d at 658 - 659 (quoting United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1996)).

Jones argues that the initial valid traffic stop developed into an unreasonable seizure as it went beyond the scope of the initial justification. For this reason, the eventual canine alert and search of Jones' car was unjustified by any exception to the warrant requirement and unlawful. Jones urges that , as the gun was the product of an unlawful search, it must be suppressed.

Earlier in the day of the hearing, the Sixth Circuit spoke to this issue in United States v.

Blair, 524 F.3d 740 (6th Cir. filed May 2, 2008), a case arising out of this district. Because the case appeared to be similar, the Court asked that the parties include a discussion of its holding in their post-hearing briefs. Jones takes the position that the facts before this Court are nearly identical to those found in Blair. Both of the cases began with a license plate violation traffic stop. In both cases the driver appeared nervous. In both cases the officer called for a canine unit while preparing a citation for the license plate offense. In both cases the driver was asked to step from the car while the canine unit smelled the outside of the car.² Jones urges that the Blair opinion is a direct mandate in support of his motion to suppress under nearly identical facts.

*Government's Position*

The United States argues the overall 22-minute detention of Jones after he was first stopped was reasonable under the circumstances presented. The government relies, in part, on United States v. Ellis, 497 F.3d 606 (6th Cir. 2007), in which the Sixth Circuit found a similar detention reasonable, and United States v. Garrido, 467 F.3d 971 (6th Cir. 2006), concluding a delay of one hour for drug sniffing dog was reasonable. The government's response to the motion to suppress details the progression of events during the 22-minute period, asserting that only nine minutes could be characterized as delay. [Doc. 16 at 7]. In support, the United States has also submitted a detailed time line of events, Exhibit 4.

Addressing the Blair case, the government argues that, while there are "superficial similarities between the two cases," the cases should be distinguished. The prosecution argues that because the defendant in Blair challenged the initial stop, the Sixth Circuit conducted a Terry analysis of the subsequent events. In Blair, the officer called for a canine unit two minutes after the

---

² Jones notes that no narcotics were found in his car, except for what Perry believed "may" have been marijuana residue, while the car in Blair did have drugs inside.

time it would have taken to issue the citation and, notably, *after* Blair had refused consent to search the car. The government argues that here the canine alerted to the car, generating probable cause to search it, "well before the conclusion of a reasonably short stop." [Doc. 23 at 2]. The government urges the Court to exclude certain time that was devoted to a discussion with Jones' grandmother and to Jones' argument with Moore about the citation, as these are not properly attributable to law enforcement delay.

## C. ANALYSIS

### I: Initial Traffic Stop

The stop of an automobile and the detention of its occupants constitutes a seizure within the meaning of the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 663 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976). A police officer may legitimately stop a car when he has probable cause to believe that a traffic violation has occurred. United States v. Sanford, 476 F.3d 391, 394 (6th Cir.2007). Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. United States v. Jackson, 470 F.3d 299, 306 (6th Cir.2006) Police may "stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." United States v. Mesa, 62 F.3d 159, 162 (6th Cir.1995). Jones does not dispute the legitimacy of the initial traffic stop. See [Doc. 18]. Moore's testimony that the license plate tag light was not functioning correctly was unchallenged. The Court finds that Moore had probable cause to believe that a violation of the traffic code had occurred and this traffic stop did not offend the Fourth Amendment. See Knoxville City Code § 17-379(b)(4). Jones essentially

8

concedes that the initial traffic stop was valid [Doc. 18 at 1], but the thrust of Jones' argument is with regard to the scope and duration of the stop.

Probable cause to believe that a traffic violation has occurred is, however, unlike probable cause to believe that a criminal violation has occurred and thus does not allow the police to detain a suspect indefinitely. United States v. Davis, 430 F.3d 345 (6th Cir. 2005). Any subsequent detention after the initial traffic stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference. The seizure must be sufficiently limited in time and the investigative means must be "minimally intrusive." United States v. Place, 462 U.S. 696, 706 (1983).

Once the purpose of initial traffic stop is completed, an officer may not further detain the vehicle or its occupants unless events during the stop give cause for a reasonable and articulable suspicion that criminal activity is afoot. Florida v. Royer, 460 U.S. 491, 500 (1983); Terry v. Ohio, 392 U.S. 1 (1968); United States v. Perez, 440 F.3d 363, 370 (6th Cir.2006); United States v. Davis, 430 F.3d 345, 355 (6th Cir. 2005); United States v. Bailey, 302 F.3d 652 (6th Cir. 2002). Unlike United States v. Blair, 524 F.3d 740 (6th Cir. 2008), the government here does not rely on Terry's "reasonable and articulable suspicion" to support any detention under these facts. The prosecution argues simply that the duration of the traffic stop was not unreasonably extended for the canine sniff, and required no further justification. It is this point that constitutes the gravamen of the dispute between the parties.

II: Scope and Duration of Stop

A seizure that is "justified solely by the interest" in issuing a ticket to the driver "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Where a narcotics-sniffing dog does not extend the length of a traffic stop, no Fourth Amendment concerns are implicated as the use of a drug-sniffing dog, by itself, does not encroach upon a motorist's reasonable expectation of privacy. Illinois v. Caballes, 543 U.S. 405 (2005). There is no specific time after which it can be said that a detention can be said to have extended beyond that which is necessary to issue a citation. The touchstone of the Fourth Amendment is reasonableness based upon the totality of the circumstances. See Ohio v. Robinette, 519 U.S. 33, 39 (1996).

In Blair, the government offered a series of circumstances to support what was ultimately determined by the Sixth Circuit to be a "thirteen-minute delay between the stop's extension and the canine unit's arrival on the scene." Blair, 524 F.3d at 753 n3. In Blair, the officer "had all the information necessary" to write a traffic citation "shortly after 22:45:31 on videotape." Blair, 524 F.3d at 752. "From that point forward, the purpose of the traffic stop would have been completed almost immediately, in the time necessary for Officer Holmes to issue the citation and send Blair on his way." Blair, 524 F.3d at 752. Instead, the officer asked for consent to search the car (itself reasonable), which was declined. Blair, 524 F.3d at 752. Thereafter, the officer informed Blair of his intention to summon a canine unit "if Blair would not consent to a search." Blair continued to refuse consent which prolonged the traffic stop to wait for the canine to arrive. Additionally, the court noted Officer Holmes' testimony ostensibly supporting their conclusion regarding delay, that 15 minutes after the initial stop (noted in the opinion as 23:01:15), the officer "proceeded to explain

10

that a canine unit was en route and that Blair would be free to go if the canine did not alert on his vehicle. He also explained that if the canine did alert on the vehicle, the officers would have grounds for a search."

Blair, 524 F.3d at 746. Accordingly, it was clear that Blair was being detained until the drug dog arrived and completed a search irrespective of when the traffic ticket was completed. Here, the defendant was detained only until the ticket was completed, irrespective of when the dog arrived. In Blair, it was the extension of the stop at this specific point that had no reasonable justification and was rejected by the Sixth Circuit, which concluded:

> This action extended the scope and duration of the stop beyond that necessary to issue a citation for a tag-light violation. Because Officer Holmes had not developed reasonable, articulable suspicion of criminal activity by that point, we hold that the remainder of the stop violated the Fourth Amendment.

Blair, 524 F.3d at 752 [emphasis added]

Turning to the case before this Court, the record establishes that Moore blue-lighted Jones at 1:45 a.m; Jones pulled to the side of the road right away. The videotape shows that by 1:46 a.m., Moore had promptly approached the driver's side window, engaged in a brief exchange with Jones, obtained his driver license and walked back to his patrol car. Moore testified at the hearing it would take him about 5 to 10 minutes under ordinary, ideal circumstances to write a citation. The circumstances of this stop were not ideal in that Moore testified that he was concerned about the driver due to "[h]is attitude toward me initially, his history, the fact that we're in a high-crime area." [Tr. at 48]. Moore testified that he was looking around the cruiser and at the driver continually as he wrote out the ticket. [Tr. at 19, 22]. The five to ten minute period, Moore testified, would include completing a local criminal records check, confirming the validity of the driver license, manually

11

filling-in the citation form, assigning a court date and explaining the ticket to a motorist.³ Ten minutes to accomplish the purpose of the stop calculates to 1:56 a.m.

By 1:57 a.m., the canine unit had arrived to circle the car, which took about 40 seconds. During this 11 minute span from the time Moore had the initial information necessary to begin to write out the citation until the arrival of the canine, two full minutes were consumed by Moore's discussion or argument with Jones' grandmother about whether she should approach the scene and talk with Jones. That time cannot be fairly ascribed as the police officer's delay. By the time the canine arrived at 1:57 a.m., Moore had completed nearly all the tasks associated with issuing the citation and approached the driver's door, asked him to step out of his car.⁴ Moore testified that he asked Jones to come back to the cruiser in order to explain the ticket and so that the canine, which had just arrived, could conduct a sniff of the perimeter of the car. In addition, at the cruiser Moore asked Jones for his Social Security Number and telephone number to complete the citation form. The citation, introduced as Exhibit 2 to the hearing, shows this information completed. In Jones' case, the canine unit arrived about two minutes after it was called, and during the time the officer was actually engaged in issuing the citation.

When viewing the course of events which took place at the time of this stop under a totality of the circumstances the Court finds that the detention, from its inception through the return of the

---

³ This testimony was not rebutted.

⁴ The traffic stop was then only extended by Jones' own arguments with the officer about the license tag light, which did not seem to have any foreseeable end, despite Moore's repeated efforts to conclude the dispute with suggested resolutions, such as the customary practice of dismissing such a ticket if Jones would make the repair and bring a receipt for the bulb to court. Moore even suggested stores where such a bulb could be bought and his understanding that store personnel would sometimes even install the bulb. Ironically, had Jones and his grandmother not engaged in protracted verbal exchanges with Moore, the stop may have even concluded before the canine unit arrived.

driver's license check and the efforts to explain the citation, did not exceed its original purpose. There is no evidence that Moore purposefully tailored the stop to draw out its duration so that the canine could arrive, and Moore's unimpeached testimony was to the contrary. The Court may not "draw a bright line limitation as to an officer's course and conduct during a stop." United States v. Hill, 195 F.3d 258, 269 -270 (6th Cir. 1999) (citations omitted). The Court finds there was no extension of the traffic stop to accommodate the canine search and that Perry and Ares arrived and searched the perimeter of the car before the purpose of the initial traffic stop was completed. Even if there was arguably an extension or delay after the time necessary to issue the citation (1:56 a.m.) Such "delay between the stop's extension and the canine unit's arrival on the scene" was only one minute (1:57 a.m.), in contrast to the 13 minute delay in Blair. See Blair, 524 F.3d at 753 n3.

Although the canine alert and subsequent search itself was not challenged by the defendant, the Court will briefly address the facts presented. In the context of automobiles, an alert from a trained, reliable canine will alone establish probable cause to search a vehicle. United States v. Diaz, 25 F.3d 392, 393-94, 396 (6th Cir.1994). The qualification of the canine Ares in this case were not challenged and the record established that he was trained to detect narcotics in 2005, and received annual re-certification for the following two years.[5] In addition, the record established the dog and his handler have participated in monthly training exercises since his original certification. Perry testified that the dog did give a positive alert to the odor of narcotics in the vehicle. At that point, the officers had probable cause to search the car for narcotics. The record established the firearms were found under the driver's seat of the car, within the scope of the indication by the canine unit.

---

[5] The date for recertification for 2008 had not yet passed at the time of the hearing.

# III: CONCLUSION

For the reasons stated herein, this Court recommends that Richard Eugene Jones' Motion to Suppress **[Doc. 14]**, be **DENIED**.[6]

Respectfully submitted,

  s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).